*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-136

SEPTEMBER TERM, 2014

| | |
|---|---|
| In re M.R. and J.D., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Washington Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 32/33-3-12 Wnjv |

Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Mother appeals the superior court's order terminating her parental rights with respect to her children M.R., born in December 2004, and J.D., born in August 2009. We affirm.

M.R.'s father, whose parental rights were terminated in a separate hearing, physically abused mother during the time he lived with her following the birth of M.R. As a result, M.R. was exposed to scenes of great turmoil and chaos during the formative years of his childhood, which had a negative impact on his development. Mother broke off contact with M.R.'s father when M.R. was three and began another relationship that produced twins born in December 2006.

In June 2008, mother was hospitalized after overdosing on drugs. That incident, together with a series of unexplained bruises and marks on the children, led the Department for Children and Families (DCF) to file a petition alleging that the children were in need of care or supervision (CHINS). The children were placed in DCF custody, and a reunification plan focusing on substance abuse treatment was put into place. Mother successfully completed an intensive outpatient program, and the children were returned to her care in January 2009 under a conditional custody order. That CHINS case was closed in April 2009.

Meanwhile, mother began a relationship with J.D.'s father, who later voluntarily relinquished his parental rights. In May 2009, mother's sister was granted a voluntary guardianship over the twins, who moved into the sister's home. Mother began using drugs again during the summer of 2011 after her father passed away. J.D.'s father moved out of the home in late 2011, and DCF began receiving numerous reports concerning mother and her drug use. In January 2012, drugs and drug paraphernalia, including needles, were found in mother's home by police executing a warrant concerning a burglary. There was evidence that a roommate had use of the apartment at the time, and mother was not charged with any drug-related offense. She was charged, however, with felony possession of stolen property that year, and received a 30-day sentence, which she served in November 2012.

In March 2012, DCF filed CHINS petitions after teachers reported seeing bruises on M.R.'s body. The source of the bruises was never conclusively established, but DCF was granted temporary custody, and the children were initially placed with mother's sister. J.D. remained with his aunt, while M.R. was later placed with his paternal grandparents and then another foster family. At a merits hearing in July 2012, mother admitted that at the time the CHINS petitions were filed, the children were without proper care. In October 2012, the court approved a disposition plan with concurrent goals of reunification or adoption. The plan established a five-month period for mother to achieve substantial progress toward reunification. She was required to submit to urinalysis upon request, complete a substance-abuse assessment and follow its recommendations, engage in mental-health treatment, obtain and maintain safe and appropriate housing, follow DOC conditions, not engage in criminal activity, attend meetings, work with family time coaches, and complete a parent-education program.

After being released from prison in early December 2012, mother did not immediately resume visitation with the children. She missed the holiday celebrations and did not acknowledge M.R.'s birthday that month. She also struggled with DOC supervision and was incarcerated for approximately three weeks on two occasions over the next several months for violating furlough conditions. These periods of incarceration disrupted the case plan and had a negative impact on the children. Mother also missed at least eighteen of the thirty-three group or individual substance-abuse sessions that were held after her initial assessment in August 2012 and before she revoked her release allowing DCF to monitor her attendance in treatment. During this period, of the seven times she was tested for drugs, she tested positive for marijuana on five occasions and alcohol on three occasions. As late as June 2013, just a few weeks before the termination hearing began, mother tested positive for cocaine. Mother missed four of seven scheduled substance-abuse sessions after she reinstated the release.

In January 2013, DCF filed petitions seeking termination of mother's parental rights with respect to M.R. and J.D. A hearing was held over five days between June and September 2013. Following the hearing, the superior court granted the petitions, concluding that there was a substantial change of circumstances due to stagnation in mother's ability to care for the children, and that termination of mother's parental rights was in the children's best interests. See In re R.W., 2011 VT 124, ¶ 14, 191 Vt. 108 ("When termination of parental rights is sought, the trial court must determine, first, whether there has been a substantial change in material circumstances and, second, whether termination is in the child[ren]'s best interests."). The court found that despite the long period that the children had been in DCF custody, mother had only limited insight into her cycle of substance abuse and was unable to take personal responsibility for her drug use or its impact on her children. The court found that although mother sincerely wanted to become drug-free, she had not made substantial progress in addressing the substance abuse and recovery components of the case plan. The court noted the significant number of substance abuse sessions that mother had missed, her decision to revoke the release allowing DCF to monitor her attendance at the sessions, and her multiple positive drug tests. According to the court, she still needed to demonstrate insight into the causes and effects of her substance abuse and then sustain a significant period of abstinence.

The court found mother's progress in the area of mental-health treatment to be even more limited. Mother had attended only three counseling sessions in March 2012 before renewing treatment just a few weeks before the scheduled termination hearing. Further, the court noted

2

that mother was unable to refrain from criminal activity, as she had been incarcerated on two occasions for misconduct while on furlough, which had a profound effect on her ability to meet the case plan requirements. Finally, the court found that mother had shown little insight or interest in learning about M.R.'s special needs, which resulted from the trauma he suffered in early childhood while under her care. The court found that although mother and the children love each other, mother had subjected them to instability as the result of her own voluntary criminal conduct and had made little progress toward addressing the issues that had led to the children's removal from her custody.

On appeal, mother argues that: (1) the superior court's conclusion weighing the importance of the bond between J.D. and her was flawed insofar as it understated the significance of that bond and did not differentiate between the two children; and (2) the court erred in concluding that DCF's termination petitions were supported by the fact that both foster families are ready to adopt the children. The State opposes mother's arguments, and the children join the State's brief urging that the superior court's termination order be affirmed.

Regarding mother's first claim of error, the superior court found that mother and J.D. have a strong attachment and a close and loving bond. Although the court acknowledges in its conclusion regarding the first best-interests factor that mother and the children love each other, it states that that factor—concerning the interaction and interrelationship of the children to parents, foster parents, and any other person who affects the children's best interests—favors the State because M.R. and J.D. are very different children, M.R.'s relationship with mother is complicated by his special needs, and mother has no insight into his needs. See 33 V.S.A. § 5114(a)(1). We recognize that, under this reasoning, the first factor would seem to favor the State with respect to only M.R. But in discussing the related fourth best-interests factor— "[w]hether the parent has played . . . a constructive role [in the children's lives], including personal contact and demonstrated emotional support and affection"—the court found that while mother has demonstrated love and affection at times, her role has been destructive in that she has subjected both M.R. and J.R. to great instability due to her substance abuse and criminal behavior. Id. § 5114(a)(4). This goes to the heart of the principal basis for the termination order—mother has been unable to make significant progress in the areas that led to the children's removal from her custody, making it apparent that she will be unable to resume her parental duties within a reasonable period of time from the perspective of the children. See id. § 5114(a)(3). Read in its entirety, the trial court's discussion of the best-interests factors demonstrates why the court believed that termination was in both children's best interests notwithstanding the existence of any bond between either of them and mother.

Regarding mother's second claim of error, the court concluded that the second best-interests factor—the children's adjustment to their home, school, and community—supported the State's petitions because both children were thriving in their respective foster homes and each foster parent was ready to adopt them. Id. § 5114(a)(2). Mother is correct that a valid termination order "does not depend on the availability of permanent foster care or adoption," In re D.M., 162 Vt. 33, 40 (1994), but that does not preclude the trial court from considering the status of the children's relationship with their foster family; indeed, the statutory best-interests factors require the court to address the children's relationship with and adjustment to the foster family. In any event, the court did not base its termination order on the willingness of the foster families to adopt the children, but rather on mother's failure to address the case-plan goals and

3

her consequent inability to put herself in a position to resume care of the children in the near future despite the passage of a significant period of time since the young children were brought into state custody. We find no error with regard to the court's discussion of the best-interests factors.

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice


_____
Marilyn S. Skoglund, Associate Justice


_____
Beth Robinson, Associate Justice